Bauman v. Boeckeler.

---

BAUMAN v. BOECKELER *et al., Appellants.*

Division One, December 23, 1893.

1. **Land:** PUBLIC USE: DEDICATION. Intent of the owner to dedicate, and acceptance by the public are essential to establish a common law dedication of land to public use.

2. ———: ———: ———: HIGHWAY. Such intent to dedicate a highway and its acceptance by the public may be established by showing a continuous adverse occupancy and use by the public as such highway, acquiesced in by the owner for the statutory period of ten years.

3. ———: ———: ———:———. Where, however, the intent of the owner to dedicate is clearly shown by evidence, *aliunde* acceptance may be established by such user for a period less than ten years.

4. ———: ———: ———: ———. The facts in evidence in this case *held* not to show an intent to dedicate to public use.

5. **Personal Injury:** FALLING GATE: PUBLIC HIGHWAY: VARIANCE. Where plaintiff founds his right to recover on the allegation in his petition that while standing in a public highway, he was injured by defendant's gate falling on him and his case is tried on that theory, and there is no substantial evidence tending to show that the place where he was injured was ever dedicated to the public, he cannot recover and a demurrer to the evidence should be sustained.

*Appeal from the Franklin Circuit Court.*—HON. RUDOLPH HIRZEL, Judge.

REVERSED AND REMANDED.

*W. B. Thompson* for appellant Boeckeler, and *J. P. Kerr* for appellant Hill-Settle Tobacco Company.

(1) The court erred in permitting the plaintiff to amend the petition after the jury was sworn. (2) The court erred in permitting plaintiff to introduce any evidence in the case. 7 Gray (Mass.), 104; *Lane v. Atlantic Works,* 111 Mass. 136; *Lyons v. Inhabitants,* 119 Mass. 491; *Hughs v. Macfie,* 2 Hurl. & Colt. 744; *Mangan v. Atterton,* L. R., 1 Exch. 239; *McGee v. Carro,* 9 C. L. J., 281; *Newson v. Railroad,* 23 N. Y. 388; *Carter v. Town,* 103 Mass. 407; *Hofnagle v. Railroad,* 55 N. Y. 608; *Parker v. Cohoes,* 10 Hunt, 531; Whittaker's Smith on Negligence, 31. (3) The court erred in admitting illegal and incompetent evidence on behalf of plaintiff against defendant's objection. (4) The court erred in making an order in appointing a next friend in said case. (5) The court erred in refusing to admit legal and competent evidence on behalf of defendant. (6) The evidence in said cause failed to show that the place where the alleged accident occurred was a public alley; plaintiff should have been nonsuited. *Pentland v. Keep,* 41 Wis. 490; *Chestnut Hill v. Peper,* 77 Pa. St. 432; *Jones v. Davis,* 35 Wis. 376; *State v. Green,* 41 Iowa, 688; *Green v. Bethea,* 30 Ga.

896;  *Talbot v. Grace*, 30 Ind. 389; 35 Kan. 777; Wasburn on Easements and Servitudes, pp. 129, 70, 212; *Stacey v. Miller*, 14 Mo. 478. (7) The evidence in said cause showed that defendant, Adolphus Boeckeler, as trustee, and those under whom he claimed had been in open, notorious, continuous and adverse possession of said premises for more than ten years prior to the institution of said suit. (8) There was no evidence of a public user of the place where the alleged accident occurred sufficient to constitute the same a public alley. See authorities cited under number 6, and, also, *Institute v. How*, 27 Mo. 211; *Becker v. City*, 38 Mo. 13; *Gowan v. Co.*, 5 Watts & S. 141; *Harkness v. Woodmansee*, 26 Pac. Rep. (Utah), 291; *State v. Proctor*, 90 Mo. 334. (9) There was no evidence to designate and define the extent of a public use of the premises where the alleged accident occurred such as to constitute said place a public alley. *Cowling v. Higginson*, 4 M. & W. 245, and authorities cited under number 8; Wood's Law of Nuisance, 174.

*W. C. Marshall* for respondent.

(1) There was no error in permitting plaintiff to amend his petition after the jury was sworn. The petition charged that it was an alley. The court permitted the word "public" to be prefixed. The court distinctly told counsel that if they were surprised thereby, to file an affidavit; otherwise the case would proceed. They did not do so, so they cannot now claim this was error. Revised Statutes, sec. 2128; *Calhoun v. Crawford*, 50 Mo. 458. (2) There was no error in permitting plaintiff to amend his petition after the motions for a new trial were overruled, and before final judgment, by striking out the words "while some boys were playing with the same," and "upon said gate being opened

and closed by said boys." *First.* This is distinctly permitted by statute. Revised Statutes, sec. 2098. *Second.* The amendment simply conformed the judgment to the facts proved. There was not a *scintilla* of testimony that the gate fell while some boys were playing with it, or upon said gate being opened and closed by said boys. *Bennett v. McCanse,* 65 Mo. 194; *Blair v. Railroad,* 89 Mo. 383; *Carr v. Moss,* 87 Mo. 447. The petition was good without amendment. *Nagel v. Railroad,* 75 Mo. 653. *Third.* This amendment was permissible, even after final judgment. Revised Statutes, sec. 2101; *Carr v. Moss,* 87 Mo. 447; *Lamb v. Railroad,* 33 Mo. App. 489. (3) The case was tried upon the question whether the alley was a public or private alley. We contend that there was no substantial conflict in the evidence that it was a public alley. But if there was a conflict, this was settled by the verdict of the jury, and will not be reviewed by this court. *Reynolds v. Rogers,* 63 Mo. 17; *Tuggle v. Railroad,* 62 Mo. 425; *Peacock v. Nelson,* 50 Mo. 256. (4) The evidence disclosed that the part of the alley where the plaintiff was injured had been open to the public and used by everybody without question ever since 1857; that the first intimation to anyone entering the alley that it stopped, was when the rock house and this gate with a sign on it "No admittance" was reached, which was south of where plaintiff was when he was injured. It had been in this condition over thirty years before the trial. This made it a public highway. *Maus v. Springfield,* 101 Mo. 613. (5) The fact that it was only open at the north end, and that at the south end it was wider than anywhere else, thereby enabling wagons to turn around at that point, does not deprive it of its public character. A *cul-de-sac* may be a highway. Elliott on Roads, p. 1, and note. (6) The fact that it was assessed for taxation, and that such taxes were paid,

does not affect its public character.   The public is not concluded from claiming an effectual dedication (by deed or user), because the land is taxed for city purposes.   Dillon on Mun. Corp. [4 Ed.], sec. 633, and note; *Elsworth v. Grand Rapids,* 27 Mich. 250; *Getchel v. Benedict,* 57 Iowa, 121; *Lemon v. Hayden,* 13 Wis. 159–663.   (7) The fact that it was not paved its full length is immaterial.   The extent of the *user* determines the extent of the alley.   *Maus v. Springfield,* 101 Mo. 613.

BRACE, J.—In this action, the plaintiff, who is a minor suing by his next friend, seeks to recover damages for injuries received by him from the falling of a large gate belonging to and on the premises of the defendant Boeckeler, which were at the time leased to the defendant, the Hill–Settle Tobacco Company, alleging in his petition that on the thirtieth of December, 1888, he was struck by the heavy post of said falling gate while standing in a public alley, contiguous to said premises, in city block 42, in the city of St. Louis, and which post he alleges was then, and for a long time prior thereto had been, in a decayed and dangerous condition; of which condition the said Boeckeler had knowledge when he leased the premises to the said Hill-Settle Tobacco Company.   The defendants answered separately, denying the allegations of the petition and pleading contributory negligence. In the trial court, the plaintiff obtained a verdict and judgment against the said defendants for $3,500, and they appealed.

It appears from the evidence that city block number 42 is bounded on the north by Cedar street, on the south by Gratiot street, on the east by First street and on the west by Second street; that in the year 1886, Richard W. Ulrice died seised of all of said block

Bauman v. Boeckeler.

except five lots in the northwest corner; that by his will he devised said real estate to the defendant Boeckeler in trust for the use of some of the testator's relatives; that the said Boeckeler accepted the trust, and as such trustee, on the third day of July, 1888, leased a portion of said real estate to the Hill-Settle Tobacco Co. described in said lease as "a certain lot of ground in city block number 42, having a frontage of 120 feet more or less on Second street and a depth of one hundred and thirty feet, more or less, running back to line of J. V. Lewis & Co." The ground thus leased to the tobacco company is represented on the following diagram by the figures A. B. C. D.

In 1881, prior to the death of Mr. Ulrice, the other portion of his real estate in said block represented by the figures D. C. K. L. M. on the diagram, had been leased by him to J. B. Lewis *et al.*, successor of the Missouri Cotton Seed Oil Co. to whom the premises had been leased in 1879; the line D. C. being the line mentioned in the lease to the tobacco company, and the dividing line between the premises leased to the tobacco company and those leased to Lewis *et al.*, successors of the oil company. On this line there was erected in 1879 a close board fence six feet high, at a point opposite the northeast corner of the stone warehouse on the diagram, and about eighteen inches from the fence, D. C., there was planted in 1880 or 1881 the gate post which fell upon the plaintiff; the post was about a foot square, ten or twelve feet long with about six or eight feet above ground, seasoned and sound when planted; to which was hung a heavy latticed gate of pine timber stayed diagonally with an iron rod and wide enough to close the space between the post at the fence and the northeast corner of the stone warehouse, against which corner it swung when closed, opening only from that corner south and east to the fence D. C., against which it rested when wide open.

It appears from the evidence that for some years prior to the year 1857, there existed an open space about twenty feet wide between the five lots belonging to different individuals in the northwest corner of the block, and the building of Mr. Ulrice situate in the northwest corner of the east half of said block, extending south into the block from Cedar street about one hundred and eighteen feet to the south line of Eberlee's lot extended east, used generally by all persons desirous of getting into the rear of the premises of the owners of these five lots or into the premises of Mr. Ulrice, who at that time was using the remaining

part of the block (all of which belonged to him) for the purposes of a distillery. In that year this space was recognized by the city authorities as an alley, and by ordinance it was required to be graded and paved at the cost of the owners abutting on it, which was afterwards, in 1862, accordingly so done, the cost thereof being paid by Mr. Ulrice and the owners of the other lots. There was evidence tending to show that it has at times been repaired by the city, and has been regarded as a public alley, and for the purposes of this opinion may be so treated.

Extending the west line of this alley twenty-six feet south, it strikes the north wall of the stone warehouse, which extends ten or twelve feet east of that extended line to the corner against which the gate shut; ten or twelve feet east of this corner (the width of the gate) stood the post which fell on the plaintiff. The evidence for the plaintiff tended to show that the plaintiff, who, with several other boys, had been playing "catcher" in and about this gateway and the surrounding premises, was standing near the gate a little north of west of the post when the gate fell, and the post struck him, which would place him when struck, within the lines a. b. C. c. e. d. a. on the diagram, a *cul-de-sac* at the mouth of the alley in the form of an irregular parallelogram, twenty-six by about thirty feet, which counsel for the plaintiff claims was a public alley and which counsel for the defendants claim was the private property of defendant Ulrice leased to the defendant tobacco company, and therefore that the plaintiff when struck, was not on a public alley, but a trespasser upon the private property of the defendant.

This *cul-de-sac* was within the boundaries of the premises leased by Boeckeler to the tobacco company on the thirtieth of December, 1888, and unquestionably was the private property of the defendants at the time

plaintiff was injured, unless before that time it had been dedicated by the owner, Mr. Ulrice, to public use as an alley. There was no evidence of a statutory dedication or of a dedication by express grant, and it is insisted for the defendants that there is not to be found in the testimony any evidence tending to show a common law dedication, and that the defendant's demurrer to the evidence ought to have been sustained, and this presents the important question in the case, in the solution of which, it will be necessary to give the evidence some further consideration.

It can be safely said that prior to the year 1879, when Mr. Ulrice leased the eastern portion of the block to the Cotton Seed Oil Company, there is no evidence in the record tending to prove a dedication of this piece of ground to the public for an alley. On making this lease, the oil company was required to erect a fence from the mouth of the paved alley to Mulberry or Gratiot street, on a line with the east line of the paved alley, to mark the boundary of the premises leased, which was accordingly so done. As originally built, this fence was probably on the line D. d. C., but afterwards for convenience, an offset was made in the fence between d. and C. and a gate put in to afford access from the oil company's premises to the paved alley. It is impossible from the evidence to delineate that portion of the fence accurately as it existed at the time of the accident; its general direction is indicated by the line D. e. c. It seems that prior to the time this fence was built, up to the end of the east line of the paved alley, some sort of a barrier—a fence or gate— was maintained at the mouth of the alley by Mr. Ulrice, which was sometimes up and sometimes down, as was but natural from its situation and the use of the property for manufacturing purposes, first in connection with a distillery and afterwards with a flouring

mill, and that persons having occasion to visit any portion of the premises entered them from this paved alley, or for convenience crossed them to adjoining streets, as it seems they could do in several directions; but until this fence was built there were no indications that any portion of those premises had been dedicated to the public use for a highway or thoroughfare beyond the mouth of the paved alley.

After the lease to the oil company, and after this fence was built, the premises west of the alley, afterwards leased to the defendant tobacco company, were leased (say in 1880 or 1881) to J. C. Schotten & Co., or at least so much thereof as is marked on the diagram as "stone warehouse" and "stable" adjoining the warehouse on the north. At that time whatever barrier or obstruction had theretofore been at any time at the mouth of the alley, was either broken, gone or was thereafter taken away, and the gate in question was erected by Schotten & Co. between the northeast corner of the warehouse and the fence as hereinbefore described and shown upon the diagram. After the building of this fence and the erection of this gate, a person coming to the south end of the paved alley, met with no permanent obstruction, and saw no fixed indications of private occupancy until he had gone twenty-six feet south to the line of the stone warehouse and the gate erected by Schotten, and the only difference between the appearance of the open space within which plaintiff was injured and the alley proper, was that the former was not paved and was wider than the latter. Schotten & Co. continued in the occupancy of these premises until within four or five months of the date at which they were leased to the tobacco company. There is some evidence that he used a portion of this *cul-de-sac* in the rear of the stable for storing hay and kept his wagons there, but from 1881, it was practically

open to anyone who might desire to use it either in going across to the gate opening into the premises leased to the oil company or to the gate opening into the premises leased to the tobacco company, which fell, or who might desire to turn around in it, and was probably used for all these purposes, but to what extent does not clearly appear.

During all this time, this *cul-de-sac* was assessed and taxed as the private property of Mr. Ulrice by the city, and as such, leased by him and his trustee to tenants. Is there any substantial evidence in the foregoing facts of a common law dedication thereof to the public use?

The question whether land has been dedicated to public use is primarily one of intent. In the language of PHILIPS, C. in *Landis v. Hamilton*, (77 Mo. 554) "In a country like ours, where landed estates are allodial, the law is justifiably jealous of the methods by which such estates are taken away from the private citizen and put into the control of an intangible public, state or municipality. This feeling or thought finds its best expression and safeguard in that provision of our organic laws which forbids the taking of private property, even for public use, without just compensation to the owner. In a case, therefore, where, without judicial proceeding or compensation, or solemn form of conveyance, it is sought to establish *in pais* a divestiture of the citizen's landed property in favor of the public, the proof ought to be so cogent, persuasive and full as to leave no reasonable doubt of the existence of the owner's intent and consent. *Irwin v. Dixion*, 9 How. 30, 31; *Brinck v. Collier*, 56 Mo. 164, 165. The conduct and acts relied on to establish the intent of the owner should be 'inconsistent and irreconcilable with any construction except such consent.' *Irwin v. Dixion, supra,* and authorities cited." And this position

is supported by the authorities generally. See 2 Dillon on Mun. Corp. [4 Ed.] sec. 636, and authorities cited, note 1 p. 752; Elliott on Roads and Streets, p. 96, note 3.

In order to constitute a valid dedication by implication of law, not only must the intention of the owner to dedicate be thus shown but acceptance by the public must also satisfactorily appear. It is not necessary however, that the intention of the owner should be made to appear by express declarations, or acceptance by the public by any direct or formal action of the municipal authorities. Both may be established by long user by the public of the land as a public highway. Dillon on Mun. Corp., *supra*, sec. 637, 642; 5 Am. and Eng. Encyclopedia of Law, p. 402 *b*, p. 414 *b*; *Kemper v. Collins*, 97 Mo. 644; *Brinck v. Collier*, *supra*.

In the last case it was said: "To constitute a valid dedication of land to the public, there must be a clear intention on the part of the owner to dedicate, which may be established in various modes, some of which are provided by statute, and others by such acts or declarations *in pais* as are satisfactory evidence of such design, and there must be an acceptance of such dedication by the public, either by user for a length of time, more or less, according to circumstances, or by its adoption by the public authorities."

Both these elements of a valid common law dedication of land to public use (intent to dedicate on the part of the owner, and acceptance by the public) may be established by showing a continuous adverse occupancy and use of the land by the public as a highway, acquiesced in by the owner for the period of ten years. *State v. Young*, 27 Mo. 259; *State v. Walters*, 69 Mo. 463; *State v. Wells*, 70 Mo. 635; *State v. Proctor*, 90 Mo. 334; *Price v. Town of Breckenridge*, 92 Mo. 378. And where the intent of the owner to dedicate is clearly shown *aliunde*, acceptance may be established by such

user for a period less than that prescribed by the statute of limitations. (See authorities cited in plaintiff's brief.) But "when use alone is relied on as evidence of a dedication of a right of way to the public, disconnected with any act of the owner showing an intention to dedicate, it must continue the length of time necessary to bar an action to recover the possession of the land." *State v. Young, supra.*

This action was commenced at the June term, 1889, of the circuit court of St. Louis city. Prior to the time Schotten erected the gate in question, which could not from the evidence have been earlier than in 1880, there is no evidence tending to show either a continuous adverse user by the public of this space at the mouth of the paved alley, or any other portion of Ulrice's premises other than the paved alley as a public highway, nor during that period was any act or declaration of the owner shown tending to prove an intent upon his part to dedicate this *cul-de-sac* or any other portion of his premises to the public for a highway; and whatever use may have been made thereof, after the gate was erected, it had not, under any circumstances, at the commencement of this suit, continued the requisite length of time, of itself, to furnish evidence of the intent of the owner to make such a dedication or obviate the necessity of showing such intent. Waiving, then, further inquiry as to whether there was evidence tending to show such a use of the *cul-de-sac* after the gate was erected as would tend to show an acceptance, contradicted as it was by the action of the city authorities in levying and collecting taxes thereon, was there, independent of such use, evidence of any unequivocal act or declaration of Ulrice tending to show an intent upon his part to make a dedication of this part of his premises to public use? The only declarations of the owner shown in the evidence in regard to this property

are, his leasing it to tenants, giving it in to the assessor as his property, and annually paying the taxes thereon— declarations entirely inconsistent with, and contradictory of, any such intent.

The only acts done were the acts of his tenant Schotten in putting up this gate at the corner of Eberlee's lot, instead of at the mouth of the alley, and of his tenant, the oil company, in making an offset in the fence and putting in a gate for its use, thereby creating this *cul-de-sac* outside the inclosure of each, and between such inclosures and the mouth of the alley, affording each convenient access to the alley and thence to Cedar street; and to the public a means of access to the property occupied by them, and incidentally an open space in which teams might be turned for any purpose; and to such a mixed use only does the evidence tend to show this *cul-de-sac* was subjected. In these facts no adverse use under claim of right in the public can be found; no substantial evidence tending to prove an intent upon the part of the owner to dedicate his property to such an use. The plaintiff's right of recovery was predicated in his pleadings, upon the fact alleged that he was injured while in a public highway, and upon this theory his case was tried and presented to the jury.

As there was no substantial evidence tending to show that the place where he was injured had ever been dedicated by the conceded owner, in fact, or by user, for a highway, the defendant's demurrer to the evidence ought to have been sustained, and for the error of the court in refusing a nonsuit, the judgment will be reversed and the cause remanded. All concur, except BARCLAY, J., absent.